ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED

MAR 3 2015

U.S. COURT OF
FEDERAL CLAIMS

ROBERTO CARABALLO and ALBERT E.
MILLER, for themselves, and on behalf of all
persons similarly situated,

                    Plaintiffs,

       vs.

The UNITED STATES OF AMERICA,

                    Defendant.

No. 15 - 223 C

## CLASS ACTION COMPLAINT

Plaintiffs Roberto Caraballo and Albert E. Miller, by and through their undersigned counsel, on behalf of themselves, the class of individuals certified by the United States District Court for the District of Virgin Islands (the "District Court") in *Caraballo, et. al v. United States*, No. 1:97-cv-00027 ("*Caraballo*"), and all persons who have come within the definition of the class in *Caraballo* after the date of certification, state and allege as follows:

## NATURE OF THE ACTION AND RELIEF SOUGHT

1.     Plaintiffs seek damages and other relief through claims for breach of contract and breach of the express and implied covenants of good faith and fair dealing arising from the United States' numerous and ongoing breaches of the Stipulation for Settlement in the *Caraballo* case (the "Settlement Agreement" or "Agreement"; attached hereto as Exhibit 1). The Settlement Agreement was executed and filed on June 16, 2000, and approved by the District Court in its August 17, 2000 Judgment, Final Order, and Decree (the "Judgment"; attached hereto as Exhibit 2).

2.     Since entering into the Settlement Agreement, the United States has consistently attempted to undermine the Agreement, circumvent its obligations under its terms, and eviscerate

the benefits Plaintiffs bargained for therein.  These actions include enactment by Congress of the Non-Foreign Area Retirement Equity Assurance Act of 2009, Pub. L. No. 111-84, §§ 1911-1919, 123 Stat. 2190, 2619-26 (the "2009 Act"), issuance of a regulation by the U.S. Office of Personnel Management ("OPM") in 2010, and numerous other actions by OPM, and by its officers and agents, during periods leading up to and after the 2009 Act was enacted.

## PARTIES

3.     Plaintiffs are or were employed by the United States, or by its agencies, instrumentalities, and corporations, in one or more of Puerto Rico, the U.S. Virgin Islands, Guam, the Northern Mariana Islands, Hawai'i, and Alaska (the "non-foreign areas") and receive or received a non-foreign (territorial) cost-of-living allowance as part of their salaries ("COLA") pursuant to Executive Order 10,000 and applicable statutes and regulations.

4.     Plaintiffs bring this action for themselves, on behalf of all members of the class certified by the Judgment in *Caraballo* pursuant to Rule 23(b)(1) and (2) of the Federal Rules of Civil Procedure (the "*Caraballo* Class"), and on behalf of all persons who have come within the definition of the *Caraballo* Class after the date of certification.

5.     Roberto Caraballo is a citizen of the United States and a resident of the U.S. Virgin Islands.  He was a named plaintiff and class representative in the *Caraballo* litigation.  He is employed by the Social Security Administration in the U.S. Virgin Islands.  Mr. Caraballo has suffered monetary and other losses as a direct result of Defendant's breaches of the Settlement Agreement.

6.     Albert E. Miller is a citizen of the United States and a resident of Hawai'i.  He was a named plaintiff and class representative in the *Caraballo* litigation.  He is employed by the Federal Aviation Administration in Hawai'i.  Mr. Miller has suffered monetary and other losses

as a direct result of Defendant's breaches of the Settlement Agreement.

7.       Defendant is the United States of America, acting through the Congress, the Office of Personnel Management, and other instrumentalities and agencies. The United States is the current or former employer of all Plaintiffs and the class. OPM is the successor to the Civil Service Commission and is the U.S. agency that manages the civil service of the federal government and is responsible for, among other things, providing employment benefits, setting COLA rates, and administering other civil service programs.

**JURISDICTION**

8.       Jurisdiction is proper in this Court pursuant to the Tucker Act, 28 U.S.C. § 1491.

**FACTS**

**The *Caraballo* Litigation**

9.       On March 17, 1997, Robert Caraballo and 19 (later amended to 137) other then-current or former federal employees in the non-foreign areas brought suit in the District Court against the United States, the United States Postal Service, and then-Director of OPM James King to redress unlawful underpayments of COLA occurring since a previous class action settlement. The *Caraballo* plaintiffs, individually and on behalf of all other similarly situated federal employees in the non-foreign areas, asserted that the defendants wrongfully paid COLA rates below certain required levels, and failed to review and revise COLA rates at the times and in the manner required by various statutes and regulations and by the prior settlement agreement.

10.      In the *Caraballo* complaint, the plaintiffs alleged that the defendants: (1) failed to consider, in establishing COLA rates based on living costs substantially higher than in the District of Columbia, the differences in goods and services available or needed between the District of Columbia and the non-foreign areas; (2) failed to compare prices of goods and

services of closely similar quality in making price comparisons for setting COLA rates; (3) adopted and utilized methodology for determining COLA rates that was arbitrary, capricious, otherwise contrary to law, and biased; and (4) failed to provide formal notice and meaningful opportunity to comment on proposed COLA rates.

11.     In *Caraballo*, the plaintiffs brought claims pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 553 and 706, and the Back Pay Act, 5 U.S.C. § 5596. They sought compensatory, declaratory, and injunctive relief, including an award of back pay and a permanent injunction reforming the methodology for setting and changing COLA rates.

12.     On June 16, 2000, after a three-year process of collaborative research and discussion involving many of the *Caraballo* plaintiffs and class members, officials at OPM, expert economists, and legal counsel, the parties agreed to settle the case and executed the Settlement Agreement.   The District Court then approved the Settlement Agreement and incorporated it into the Judgment on August 17, 2000.

13.     The Judgment certified the following class of federal employees in the non-foreign areas who were entitled to receive or who did receive COLA at any time on or after October 1, 1990:

> All persons employed by the United States or an agency, establishment, or instrumentality thereof, or by a corporation owned by the United States, including the United States Postal Service, the Administrative Office of the United States Courts, the General Accounting Office, the Non-Appropriated Fund agencies, who are or were entitled to receive, or did receive, a non-foreign (territorial) cost-of-living allowance, or a like payment as part of or in addition to basic pay, pursuant to 5 U.S.C. § 5941, 5 C.F.R. §§ 591.2[01]-203, and/or Executive Orders 10,000[0] and 11,137, or pursuant to other statute, regulation, administrative practice, or contract, at any time on or after October 1, 1990.

(Ex. 2 at 2.)

**Substance of the Settlement Agreement**

14.     The Settlement Agreement provided for a wide range of relief.  On the one hand, it called for a monetary payment of $232.5 million to the *Caraballo* Class to compensate them for underpayments of COLA between October 1, 1990 and September 30, 2000.  On the other hand, and of far greater importance and value to the *Caraballo* Class, the Settlement Agreement included significant and detailed obligations on the part of Defendant regarding the future of the COLA program.

15.     Defendant's obligations under the Settlement Agreement included, *inter alia*, the implementation of a new and carefully-described methodology for setting and changing COLA rates.  This agreed methodology was called the "Conforming Methodology" and was based on a list of agreed principles referred to as the "Safe Harbor Principles."  The parties understood that the Conforming Methodology provided for substantial increases in current and future COLA rates and required significant changes—both immediate and future—to the then-existing regulations and published methodology governing the operation of the COLA program.

16.     At the core of the Settlement Agreement was the recognition by the parties that living costs are higher in non-foreign areas, not only because of higher price levels, but also because of the remoteness and other circumstances of these unique areas.  These circumstances require expenditures for additional goods and services not needed within the contiguous United States to maintain the same standard of living.  Accordingly, among other methodological changes, the Settlement Agreement required the addition of an "adjustment factor"—in the amount of five, seven, or nine percentage points, depending on the area—to the COLA rate indicated by the price level difference alone, in order to compensate for additional needs.  Without this increment, the parties agreed, the COLA rate would be far less than authorized and

directed by Congress to offset the exceptionally high costs of living in non-foreign areas.

17.    The Settlement Agreement also established a three-year cycle for price surveys in each non-foreign area and specified that COLA rates could be reduced—if and when a reduction is ever indicated by the Conforming Methodology—by no more than one percentage point per year.

18.    Although the Settlement Agreement left OPM some discretion in implementing the Conforming Methodology, that discretion was strictly limited.  The parties required any departure from the agreed methodology to be preceded by notice to the *Caraballo* Class, published by OPM, with opportunity for comment by class members and representatives. Furthermore, Defendant was required to implement the Settlement Agreement "in good faith," and in cooperation and consultation with certain committees of class members, experts, and others formed by the Settlement Agreement.  Specifically, Defendant agreed as follows:

> The development, implementation, and revision of the New Regulations, and the implementation of this settlement in all other respects, shall be undertaken and conducted by OPM in good faith in accordance with the principles contained in Exhibit A [the Safe Harbor Principles] and in cooperation and consultation with the Survey Implementation Committee ('SIC') and with any other committees established under the Safe Harbor Principle 24 of Exhibit A.

(Ex. 1 § 6.)

19.    The parties also agreed to restrict the future liability of Defendant with regard to future COLA rates and methodology "so long as OPM's regulations and the rates set for COLA thereunder in each area are reasonably consistent with the Conforming Methodology."  The Settlement Agreement made clear that Defendant would be liable for damages and other relief should OPM fail to abide by the terms of the Agreement or comply with other applicable laws.

**Defendant's Initial Compliance with the Settlement Agreement**

20.    On April 5, 2001, the President signed Executive Order 13,207 in conformity with several provisions of the Settlement Agreement.   Among other provisions, Executive Order 13,207 authorized OPM to conduct COLA surveys on the schedule set forth in the Settlement Agreement and to limit any COLA rate reductions to one percentage point per year as required by the Settlement Agreement.

21.    By August 2001, OPM began discussing legislative options with the U.S. Department of State, the U.S. Office of Management and Budget, and the U.S. Department of Defense ("DOD"), aimed at providing greater compensation, consistent with the Settlement Agreement, to employees in the non-foreign areas.

22.    In a September 21, 2001 letter from Kay Coles James, Director of OPM, to David S. C. Chu, the Under Secretary of Defense for Personnel and Readiness, OPM disclosed a plan to increase benefits to employees in the non-foreign areas.  OPM's plan was to extend "locality pay" to these employees.[1]   According to Director James, OPM's plan was "that a portion of COLA would be offset by locality pay, but that employees' take-home pay would be protected." This plan (the "2001 plan"), therefore, proposed shortly after the *Caraballo* settlement, was to pay employees in the non-foreign areas both locality pay and COLA, and to protect employees' take-home pay.  It is an example of OPM's initial good faith efforts to implement the Settlement Agreement and its good will toward federal employees in the non-foreign areas—actions and

---

[1] The locality pay program was enacted by Congress in 1990 as a means of increasing federal salaries throughout the contiguous United States, with greater percentage increases to a federal employee's General Schedule ("G.S.") salary given for work in high-labor cost areas such as Washington-Baltimore-Northern Virginia.  Unlike COLA, which is paid based on comparative living costs measured through consumer price surveys, locality pay is paid based on the local costs of living as measured by local costs of labor (the purported differences between labor costs in the private and federal sectors in a particular area).

sentiments that have not been seen from OPM since 2001.

23.     The basic concept advanced by OPM in 2001—to provide federal employees in the non-foreign areas with both COLA and locality pay, and to "offset" (in the words of Director James) a portion of COLA by locality pay—had been proposed previously by the *Caraballo* parties' independent economic advisers.[2]   It was entirely consistent with the Settlement Agreement.   If implemented, the 2001 plan would have enabled the COLA and locality pay programs, working together, to accomplish what neither program could do alone given their different statutory purposes and methodologies:   it would have accurately compensated members of the *Caraballo* Class for their higher costs of living while protecting take-home pay.

24.     In his November 29, 2001 reply to Director James, Under Secretary Chu declined to endorse OPM's plan for paying both COLA and locality pay, stating that "the majority of the costs for providing locality pay to overseas white-collar employees in foreign and nonforeign areas would be directed to [the Department of Defense]."

**Defendant's Subsequent Efforts to Undermine the Settlement Agreement**

25.     After the DOD rejected OPM's 2001 plan, OPM, upon information and belief, changed course and embarked on the cost-cutting path desired by the DOD.   OPM, the nation's agency for administering civil service laws enacted by Congress, thus began an extended campaign to change those laws and undercut the Settlement Agreement by further reducing the pay of federal employees in non-foreign areas relative to the pay of federal employees in the contiguous United States.   It included abandoning the principle that "employees' take-home pay would be protected" and disseminating false, incomplete, and/or misleading information to

---

[2] Those economic advisors became members of the Technical Advisory Committee ("TAC"), a committee created by the *Caraballo* settlement to field questions and resolve disagreements concerning economic principles, theories, and practices relating to the interpretation or application of the Safe Harbor Principles.

Congress, class members, and the public.  This campaign culminated in the passage of the 2009 Act and OPM's adoption of a regulation in 2010, all of which breached the express and implied terms of the Settlement Agreement, including the covenant of good faith and fair dealing.

26.     In or around April 2002, OPM made a formal legislative proposal to reduce and phase out COLA.  Unlike its 2001 plan, OPM's 2002 proposal sought to completely replace COLA over time at the rate of one locality pay dollar for 65 cents of a COLA dollar, effective December 31, 2002.  The 2002 proposal would have left class members with only an after-tax equivalent amount of locality pay, even though the locality pay methodology (as designed and administered by OPM) is incapable of taking into account the unique circumstances of the non-foreign areas (as COLA is designed and intended to do pursuant to the Settlement Agreement).

27.     Ostensibly, the purpose of the 0.65 conversion factor was to allow for the fact that COLA is exempt from federal income tax and from income tax collected in certain non-foreign areas, while locality pay is fully taxable at federal and all non-federal levels.  This may have been an appropriate offset of the kind proposed by Director James in 2001.  However, in OPM's 2002 proposal, the idea of an offset was recast into a different form.  The offset would operate to consume COLA entirely over time, rather than fairly eliminating the limited overlap between the effect of the two kinds of additional compensation based on different statutory purposes and methodologies.  Only locality pay, incapable of providing equal pay for equal work in the remote and unique non-foreign areas, would remain under OPM's plan.  Upon information and belief, OPM intended the debate over the proper rate of offset to distract attention from the fact that, at the end of the day, COLA would be gone and the purposes and goals of the Settlement Agreement would be frustrated, if not eviscerated entirely.  The *Caraballo* Class would be denied the benefit of its bargain.

28.     Even on day one of the multi-year period proposed by OPM for phasing out COLA and restricting additional compensation in non-foreign areas to locality pay, the proposed conversion rate would not have been sufficient to protect employee take-home pay for many federal workers.   More fundamentally, however, locality pay rates are not adjusted for extraordinarily high living costs or any other circumstances that are unique to the non-foreign areas.   Adjusting salaries in the non-foreign areas to reflect these unique circumstances was a cornerstone of the Settlement Agreement.   The legislation proposed by OPM would have destroyed this foundation, breached the Settlement Agreement, and resulted in a significant decrease in the take home pay of employees in the non-foreign Areas.   OPM's 2002 proposal was not acted upon by Congress.

29.     On May 30, 2007, OPM again proposed legislation to replace COLA with locality pay.   In its transmittal letter from OPM Director Linda Springer to the President of the Senate, OPM (i) bemoaned how "the COLA program has been fraught with litigation, and has cost the Federal Government hundreds of millions of dollars in settlement payments and attorney fees," (ii) referenced "the *Caraballo* settlement, in which OPM agreed to implement a new methodology including a three-year survey cycle beginning with the Caribbean in 2002," and (iii) blatantly acknowledged that the proposal was being advanced "[i]n an effort to address these issues."

30.     In support of its 2007 proposal, OPM also disseminated a PowerPoint Presentation entitled "Non-Foreign Area Cost of Living Allowance (COLA) Transformation" that contained similar references to the *Caraballo* litigation and the desire to have legislation passed to address the "[c]ost of past, present, and future litigation."   Through the presentation, OPM also falsely claimed that its "proposal would . . . [p]rotect employee take-home pay in all

10

non-foreign COLA areas." Other materials distributed by OPM, including answers to frequently asked questions and a tool for estimating the effect of transition from COLA to locality pay, were false, incomplete, and/or misleading in that they assured federal employees their take-home pay would be protected by OPM's legislative proposal and they would be better off. Similarly false, incomplete, and/or misleading information was distributed by OPM and Senate subcommittee members and staff during meetings with federal employees and employee groups in Hawai'i during the week of July 4, 2007.

31.     Under OPM's proposed "Locality Pay Extension Act of 2007," COLA rates in effect on December 31, 2007, would be locked in place and OPM would no longer conduct COLA surveys as required by the Settlement Agreement. Beginning with the first pay period in January 2008, and continuing for a seven-year period, locality pay would be phased in for federal employees in the non-foreign areas at a rate of one locality pay dollar for every 85 cents of a COLA dollar. This proposed conversion rate would have greatly accelerated the process of eliminating COLA, as compared with the 0.65 conversion rate proposed in 2002, in contravention of the cornerstone of the Settlement Agreement. Moreover, from the first day of the conversion process, the factor proposed in 2007 would have been grossly inadequate to take into consideration the high value of COLA owing to its tax-exempt status. The result would have been an immediate reduction of COLA payments, replacing these carefully calculated payments with locality pay of much lower after-tax value, and leaving higher costs of living uncompensated. Like the 2002 legislative proposal, OPM's 2007 proposal was not enacted by Congress.

32.     In 2008, legislative proposals to replace COLA with locality were made in both the Senate and House of Representatives. Congress, like OPM, seemingly understood that

phasing out COLA would impact and undercut the *Caraballo* Settlement Agreement. The introductory statements for the Senate bill, given on May 13, 2008, referenced the *Caraballo* litigation by name. Indeed, Senate Report No. 110-456 discussed the Settlement Agreement, the Conforming Methodology, and the Safe Harbor Principles. Any failure by Congress to fully grasp the impact and consequences of these legislative proposals was caused by OPM. By 2008, OPM, through the dissemination of false, incomplete and/or misleading information and the omission of critical information, had convinced members of Congress that a legislative solution similar to that proposed by OPM would be best for federal workers in the non-foreign areas.

33.    Despite the Settlement Agreement, the 2008 legislative proposals would have locked in then-current COLA rates and completely eliminated COLA over a period of years (during which federal employees in non-foreign areas would have been denied raises paid to all other federal employees). The proposals would have phased in locality pay over three years and applied a 0.65 percent offset. Despite representations by legislators that the Senate bill "seeks to protect employee's [*sic*] take home pay . . . [and to] be careful to do no harm," the effect would have been to replace the agreed COLA methodology with a locality pay methodology that was not designed to account for the unique circumstances of non-foreign areas. As with prior proposals, the 2008 legislative proposals would have eviscerated the Settlement Agreement and fallen far short of the "ultimate goal . . . to ensure that Federal workers in the nonforeign areas are not disadvantaged when it comes to their pay and retirement."

34.    Representatives of OPM and Senate subcommittee representatives met with federal employees and employee groups throughout the spring of 2008 in various locations. Senate subcommittee field hearings were held in May 2008 concerning the Senate bill and OPM's proposal. Among other participants, OPM's Deputy Associate Director for Performance

and Pay Systems, Charles D. Grimes III, testified at the field hearings. In his testimony, he referred to the Settlement Agreement and testified about how OPM's 2007 proposal was transmitted to Congress to address and reduce such litigation risk. Additionally, in an attempt to sway the Senate and participants to support a 0.85 conversion rate (over the more-generous but still inadequate 0.65 rate proposed by the Senate), Mr. Grimes testified that OPM's proposal "would, we believe in the vast majority, if not all cases, prevent any decrease in take-home pay." He did so without explaining that federal employees in non-foreign areas would be denied for decades pay increases received by all other federal employees (including Mr. Grimes), and that the standards of living afforded by federal salaries in non-foreign areas would continue to decline even after raises again became possible due to inherent differences between COLA methodology and locality pay methodology. A PowerPoint presentation to field hearing participants by the Senate Committee on Homeland Security & Governmental Affairs similarly proclaimed that the Senate legislation was designed to "[p]rotect employees' take-home pay," further disseminating this false, incomplete, and/or misleading information.

35.     OPM continued to disseminate false, incomplete, and/or misleading statements during the legislative process, resulting in legislators being convinced that the proposed legislation would address the extremely high costs of living in the non-foreign areas and protect employees' take-home pay without creating the additional costs that the DOD had long ago sought to avoid. As one prominent legislator stated on June 25, 2008, when the 2008 Senate bill passed the Senate Committee on Homeland Security & Governmental Affairs, "With prices for everything from housing and gasoline to bread and milk constantly rising in the islands [of Hawai'i, Alaska, and the Territories], this bill will ensure that federal employees' take-home pay is protected."

36.    During the same period that OPM was disseminating false, incomplete, and/or misleading information  about the impact of the proposed legislation to Congress, the class, and the public, OPM, upon information and belief, was also seeking amendments to the proposed legislation that exposed federal employees to losses in take-home pay.  Upon information and belief, OPM advocated for and achieved a committee amendment to the text of the 2008 Senate proposal (S. 3013) that removed a general savings provision which before that time had provided as follows:

> The application of this Act to any employee may not result in the amount of the decrease in the amount of pay attributable to special rate pay and the cost-of-living allowance as in effect on the date of enactment of this Act exceeding the amount of the increase in the locality-based comparability payments paid to that employee.

Replacing that robust guarantee to federal workers was a significantly less concrete savings provision providing, "It is the sense of Congress that the application of this Act to any employee should not result in a decrease in the take home pay of that employee."

37.    During the promotion of proposed legislative options to reduce COLA by locality pay, OPM officials on numerous occasions made false, incomplete, and/or misleading statements and omissions to members of Congress, members of the class, and federal employee groups for the purpose of drumming up support for the elimination of COLA by improperly implying that an equivalent form of additional compensation would instead be provided.  These statements were in turn widely distributed to federal employees and members of the public, who believed them to be true, resulting in support for the legislative proposal that eventually passed.

38.    OPM's false, incomplete, and/or misleading statements and omissions about the conversion from COLA to locality pay included, but were not limited to, the following:

a.    OPM misrepresented in various communications to Congress and to

14

members of the class that its legislative proposals would "protect" the take home pay of federal employees, a misrepresentation that many class members now consider to have been intentionally misleading;

b.      OPM failed to inform Congress, in a full and fair manner, unbiased by the parochial interests of certain agencies and of OPM itself, of Defendant's general and specific obligations under the Settlement Agreement, of the contractual rights of *Caraballo* Class members to retain the fruits of the Settlement Agreement, of the express and implied duties of good faith and fair dealing imposed on Defendant by the Settlement Agreement and common law, and that the legislation OPM was proposing would constitute a manifold breach of the Settlement Agreement;

c.      OPM failed to disclose to Congress basic information having a fundamental bearing on the legislation under consideration, including failing to present any alternatives to the legislative approach it preferred, *i.e.*, to eliminate COLA entirely and replace it with locality pay.  One option that deserved consideration was bringing non-foreign areas into the locality pay program without reducing COLA, as members of the Technical Advisory Committee in *Caraballo* had recommended.  There were other options as well.  Instead, OPM continued to disregard, as it had since 1994, specific and repeated Congressional directives requiring the agency to undertake "a consideration of alternative approaches to dealing with the unusual and unique circumstances of the affected areas"; and

d.      OPM failed to apprise Congress and federal employees of the limitations of the locality pay program and methodology, and of the fact that converting COLA to locality pay inevitably would result, regardless of how fast or slow the transition, in lower

salaries and living standards for federal employees in non-foreign areas as compared with salaries and living standards of all other federal employees in the United States.

39.     As part of the pattern of misinformation and deception outlined above, the legislation proposed by OPM in 2002 and 2007 and introduced in Congress at the behest of OPM in 2008 contained a well-hidden but extremely adverse feature which has never been disclosed or explained by OPM.  For the foreseeable future, the benefit of nationwide increases in locality pay rates would be denied to employees in non-foreign areas.  In these vital areas, under the terms of the legislation proposals advocated for by OPM, increases in locality pay would be offset dollar-for-dollar by reductions in COLA.  The number of after-tax dollars above G.S. salaries would remain constant in the non-foreign areas, while such dollars can and would increase everywhere else in the United States.  The real value of federal salaries in non-foreign areas would decline with inflation, while the salaries of all other federal employees would be increased to keep up with inflation and to provide real-dollar increases as warranted by other factors.  This hidden feature—the "salary lag"—was, upon information and belief, understood by OPM but was not disclosed to Congress or others while the agency was promoting its preferred legislation.

**The 2009 Non-Foreign AREA Act and OPM's Implementing Regulation**

40.     The 2008 Senate bill, as amended, passed the Senate by Unanimous Consent on October 2, 2008, but was never approved by the House.  With minor revisions, however, legislators re-introduced the 2008 Senate bill in both the House and Senate in March 2009 as the "Non-Foreign AREA Act of 2009."

41.     As with prior legislative proposals, substantial misinformation was widely distributed by OPM and other officers and agents of the administration concerning the intent and

effects of the legislation.  For instance, even though locality pay is not based on the substantially higher costs of living in the non-foreign areas as compared to Washington, D.C. (as COLA is), the legislation's sponsors, including Senator Begich from Alaska and Delegate Faleomavaega from American Samoa, had been convinced by OPM that the conversion to locality pay would help address the higher costs of living in the non-foreign areas.  Even Senator Akaka, the Senate bill's primary sponsor, had been misled by OPM and relayed in his introductory statements to the Senate OPM's false, incomplete, and/or misleading assertion that the bill would "protect employees take-home pay."  As reflected in the October 14, 2009 report of the Senate Committee on Homeland Security and Governmental Affairs, the legislation was intended "to resolve the pending [*sic*] litigation," and expressly referred to the *Caraballo* litigation and the Settlement Agreement.

42.     Disregarding the terms of the Settlement Agreement, Congress enacted the Non-Foreign Area Retirement Equity Assurance Act of 2009 on October 28, 2009.  The 2009 Act was passed into law as part of the National Defense Authorization Act for Fiscal Year 2010, Public Law 111-84.

43.     The 2009 Act amended 5 U.S.C. § 5941 by ending periodic surveys of living costs in non-foreign areas and the Washington D.C. area and mandating that COLA rates be reduced to zero (in accordance with a formula) over an open-ended period of years.  It also amended 5 U.S.C. § 5304 by requiring OPM to include each of the non-foreign areas in a locality pay area and thus begin to pay locality pay.  The 2009 Act provides for the gradual reduction of the COLA rate for each non-foreign area in lock-step with the gradual increase in the locality pay rate for that same area.  It applies a conversion factor of 0.65 (rather than 0.85 as proposed by OPM in 2007) and it specifies that locality pay be phased in over a two-year period ending

January 1, 2012 (rather than over a seven-year period as proposed by OPM). The phase-in of locality pay has little, if anything, to do with the process of replacing COLA with locality pay, which may require decades to complete. During that time, nationwide increases in locality pay rates will be of no benefit to class members in this case, who will see their salaries and living standards inexorably decline in relation to the salaries and living standards of federal employees everywhere else in the United States.

44.     The 2009 Act includes substantially the same "savings provision" as that in the 2008 legislation, providing the "sense of Congress" that "the application of this subtitle to any employee should not result in a decrease in the take home pay of that employee." However, a statement that take home pay should not be "decreased" over a potential transition period of 10 to 30 years falls far short of "protecting the take home pay" of employees, as OPM had repeatedly promised audiences of federal employees and members of Congress that it would do. The disingenuous language of the savings provision was intended to mislead federal employees and members of Congress (as well as the public) not to protect federal employees.

45.     For its part, OPM abandoned the Conforming Methodology and proceeded to issue a regulation in further breach of the Settlement Agreement. On September 30, 2010, pursuant to the 2009 Act, OPM issued a new regulation, 75 Fed. Reg. 60285 (the "2010 Regulation"), which (1) placed Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands (and certain other non-foreign areas which are not eligible for COLA) in the Rest of U.S. ("RUS") locality pay area, and (2) established new state-wide locality pay areas for Hawai'i and Alaska. The regulation did not address the methodology for setting locality pay rates within these areas. By default, the regulation enables the rate-setting methodology to be applied to all non-foreign areas (including Hawai'i and Alaska) without any consideration of the

unique circumstances of non-foreign areas.   The notice published by OPM in the Federal Register was the first notice to the class or available to the public of the decisions that had been under consideration by the agency.

46.   At no time prior to issuing the 2010 Regulation did OPM or its attorneys in the *Caraballo* case contact the attorneys for the *Caraballo* Class, or any other representatives of the *Caraballo* Class, to inform them of the agency's intentions regarding the issuance of a regulation or the matters to be covered by regulation.   No such contacts have been made since the regulation was issued.

47.   The procedure followed by OPM in issuing the 2010 Regulation was highly unusual.   By its terms, the regulation was issued "On behalf of the President's Pay Agent" and became effective one month later, on November 1, 2010, regardless of any comments which might be submitted.   The notice in the Federal Register stated that comments "must" be received on or before November 29, 2010, but, nonetheless, that the locality pay rates it enabled would be effective on the first day of the first pay period beginning on or after January 1, 2011.

48.   Significant comments and objections were made to the 2010 Regulation.   On November 26, 2010, counsel for the *Caraballo* Class sent a letter to OPM stating the class's objections to the 2010 regulation and explaining that it failed to comply with the terms of the Settlement Agreement.

49.   Three independent economists, serving on the TAC—a committee created by the *Caraballo* Settlement—reviewed, independent of any request by OPM, the comments and objections made to the 2010 Regulation.   In a December 29, 2010 letter transmitted to OPM several days later, Dr. Harold Watts stated on behalf of the TAC that OPM's proposed regulation and the comments merited careful consideration and that the TAC "would be willing and able to

undertake an appropriate role" in a process of reviewing the locality pay methodology and recommending appropriate adjustments for application to non-foreign areas, as to which matters the TAC has unquestionable and unique expertise. The agency never responded to Dr. Watts's letter.

50.    On June 7, 2011, OPM published a notice (76 Fed. Reg. 32859) with respect to the regulation it had issued on September 30, 2010 (to implement the 2009 Act), rejecting all of the comments and suggestions submitted by the *Caraballo* Class and others. The effect of the notice was to adopt the 2010 Regulation "as a final rule, with minor changes." In the Notice, OPM implicitly admitted that it did not consider the effect of its actions on the Settlement Agreement and acknowledged that the 2010 regulation did not comply—and in fact was not intended to comply—with the Settlement Agreement.

51.    There were, and still are, regulatory options that would mitigate the damage to the class caused by the 2009 Act and by the prior and subsequent misconduct of OPM. The very section of the 2009 Act that provided regulatory authority to OPM (Section 1918(a)) could have been used by OPM to protect the class from the effects of the 2009 Act to prevent violation of their rights under the Settlement Agreement. Furthermore, the 1990 legislation that established locality pay areas for the contiguous United States provides OPM at 5 U.S.C. § 5304(i) the authority to "prescribe regulations, consistent with the provisions of this section [5 U.S.C. § 5304] governing the payment of comparability payments to employees." Additionally, 5 U.S.C. § 5305 authorizes OPM to increase salary rates under the General Schedule and similar pay systems by up to 30% in selected "areas or locations" whenever such action is considered "appropriate" by OPM due to "the remoteness of the area or location involved" or "any other circumstances." Each of these grants of rulemaking authority was available to OPM and could

have been utilized, in any combination, to avoid, mitigate, or rectify some or all of the breaches of the Settlement Agreement.

**The Effect of the 2009 Act and OPM's Regulation**

52.      By and through the 2009 Act and the adoption of OPM's 2010 Regulation, Defendant abandoned the Conforming Methodology without notice, contrary to the requirement of Section 10.4.3 of the Settlement Agreement, and implemented what can be called a "New Methodology" for calculating COLA rates.  The New Methodology was adopted, just as the Conforming Methodology was abandoned, without notice and without providing any other opportunity for the *Caraballo* Class and its representatives and advisers, including TAC members, to provide meaningful comments and recommendations, all in in contravention of Sections 6, 7, and 10.4.3 of the Settlement Agreement.

53.      The "New Methodology" can be summarized as containing the following elements, of which the elements in subparagraphs a-h below are directives of Congress in the 2009 Act and the elements in subparagraphs i-l are decisions of OPM in its 2010 Regulation or in default of issuing other regulations:

a.      Discontinue surveying the costs of living in non-foreign areas and in the Washington D.C. area, which surveys have been conducted periodically by OPM and its predecessor since 1948;

b.      Discontinue basing COLA rates on the amount by which living costs in non-foreign areas exceed living costs in the D.C. area;

c.      Correlate COLA rates with locality pay rates, which are based on measured or assumed differences in federal and non-federal salary costs;

d.      For each non-foreign area, calculate the COLA rate solely by reference to

the locality pay rate for an "applicable" locality pay area;

    e.    During a two-year transition period (2010 and 2011), reduce COLA rates in accordance with a transition rule;

    f.    After the transition period, offset (reduce) COLA and COLA rates in 2012 by an amount considered to represent the after-tax value of locality pay using an assumed tax burden on locality pay of 35% in all areas;

    g.    Continue to reduce COLA and not limit the offset to the portion of COLA that is duplicated by locality pay in purpose and effect;

    h.    In each year after 2012, make a further reduction in the COLA rate for a given area upon each increase in the applicable locality pay rate (or increase the COLA rate in the unlikely event of a reduction in the applicable locality pay rate), using the same formula used for the 2012 offset, until the COLA rate reaches zero, which point will not be reached for an indeterminate number of years or decades;

    i.    Use, as the applicable locality pay area for all non-foreign areas in Alaska, a locality pay area consisting of the entire state of Alaska;

    j.    Use, as the applicable locality pay area for all non-foreign areas in Hawai'i, a locality pay area consisting of the entire state of Hawai'i;

    k.    Use, as the applicable pay area for all other non-foreign areas—*i.e.*, Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands—the locality pay area called RUS (Rest of United States), which previously was a multi-state region within the contiguous United States; and

    l.    Fail to issue regulations (as authorized by Congress) to increase G.S. rates in non-foreign areas by amounts sufficient to replace that portion of COLA which has

been eliminated by locality pay yet which is needed to meet and serve the unique needs of federal employees in those areas and to provide pay of equivalent value for work of equivalent value throughout the federal workforce.

54.    Not only was the New Methodology adopted without the proper notice and consultation, as required by the Settlement Agreement, its adoption further breached express terms of the Settlement Agreement in that it departed radically in many ways from the required Conforming Methodology.   Along with OPM's dissemination of false, incomplete, and/or misleading statements and omissions leading up to the passage of the 2009 Act, Congress' enactment of the 2009 Act, OPM's adoption of the 2010 Regulations, and other acts of Defendant breached the express and implied duties of good faith and fair dealing imposed on Defendant by the Settlement Agreement and common law.

**Plaintiffs' Notices of Breach and Attempts to Rectify Defendant's Actions**

55.    Since the passage of the 2009 Act, Plaintiffs and the *Caraballo* Class, through their counsel, have made multiple attempts to engage Defendant and OPM, through their counsel, in a constructive discussion regarding compliance with the terms of the Settlement Agreement.  However, Defendant, OPM and their attorneys have consistently refused to discuss the Settlement Agreement with counsel for the Plaintiffs and the *Caraballo* Class.  Plaintiffs' latest attempt to engage OPM occurred on February 11, 2013, when Plaintiffs' counsel sent a letter to Defendant's counsel detailing Defendant's various breaches of the Settlement Agreement.  Defendant never responded to this letter.  The efforts by Plaintiffs, the *Caraballo* Class, and their counsel are more than sufficient to have exhausted the Settlement Agreement's internal dispute resolution procedures.

## CLASS ACTION ALLEGATIONS

**Class Definition**

56.     Plaintiffs bring this action for themselves and on behalf of the following class of persons (the "Class"), which is the class previously certified by the District Court in *Caraballo*:

> All persons employed by the United States or an agency, establishment, or instrumentality thereof, or by a corporation owned by the United States, including the United States Postal Service, the Administrative Office of the United States Courts, the General Accounting Office, and Non-Appropriated Fund agencies, who are or were entitled to receive, or did receive, a non-foreign (territorial) cost-of-living allowance, or a like payment as part of or in addition to basic pay, pursuant to 5 U.S.C. § 5941, 5 C.F.R. §§ 591.201-213, and/or Executive Orders 10,000 and 11,137, or pursuant to other statute, regulation, administrative practice, or contract, at any time on or after October 1, 1990.

The Class includes those persons who have come within the definition of the *Caraballo* Class after the date of the *Caraballo* Settlement Agreement.

**Class Action Criteria**

57.     There are in excess of 40,000 members in the Class.  Joinder of all Class members is therefore impracticable.

58.     The claims of the named Plaintiffs are typical of those of all members of the Class.

59.     The questions of law and fact that are presented are applicable in common to all Class members.

60.     The named individual Plaintiffs are members of the Class and represent a variety of classifications and agencies.  They have retained counsel who are experienced in class action litigation and litigation against the United States, including class actions involving the COLA program.  The named Plaintiffs and their counsel will fairly and adequately represent and protect

the interests of the Class.

61.     The Class is large in number and widely dispersed.  The prosecution of separate actions by fewer than all members of the Class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant, and that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

62.     Defendant has acted or failed to act on grounds generally applicable to the Class.

63.     Common questions of law or fact predominate over any question affecting any individual member of the Class.  It would be financially impractical, if not impossible, for Class members to prosecute their claims on an individual basis in non-class suits. A class action is the only available means for the fair and efficient adjudication of this matter.

## FIRST CLAIM FOR RELIEF:
## BREACH OF EXPRESS TERMS OF THE SETTLEMENT AGREEMENT

64.     Plaintiffs repeat and incorporate by reference the foregoing allegations as if fully set forth herein.

65.     The June 16, 2000 Settlement Agreement in *Caraballo* is a valid and binding contract between Plaintiffs and the members of the Class and Defendant.

66.     Defendant has breached the express terms of the Settlement Agreement by, *inter alia*, passing the 2009 Act, adopting the 2010 Regulation, and developing and implementing the New Methodology.

67.     Specifically, Defendant's breaches of the Settlement Agreement include, but are not limited to, the following:

a.      Defendant developed and implemented the New Methodology without notice and opportunity for the *Caraballo* Class and others to provide meaningful

comment and be considered as part of a forum for full discussion, all in breach of Section 10.4.3 of the Settlement Agreement;

       b.     Defendant developed and implemented the New Methodology without cooperation from and consultation with the Survey Implementation Committee and other committees, including the TAC, established by the Settlement Agreement, in breach of Sections 6 & 7 of the Settlement Agreement; and

       c.     Defendant breached the Settlement Agreement, including the Safe Harbor Principles contained in Exhibit A to the Settlement Agreement, by departing radically in many ways from the Conforming Methodology required to be applied, including affecting a reduction in COLA rates of more than one percent (1%) per year and reducing COLA rates in several areas below the minimum levels required by the Conforming Methodology, and eliminating the three-year cycle of price surveys.

68.     As a result of Defendant's breaches of the Settlement Agreement, Plaintiffs and members of the Class each have been damaged in excess of $10,000, in an amount to be proven at trial.

### SECOND CLAIM FOR RELIEF:
### BREACH OF EXPRESS AND IMPLIED
### COVENANT OF GOOD FAITH AND FAIR DEALING

69.     Plaintiffs repeat and incorporate by reference the foregoing allegations as if fully set forth herein.

70.     The June 16, 2000 Settlement Agreement in *Caraballo* is a valid and binding contract between Plaintiffs and the members of the Class and Defendant.

71.     Defendant was required by the express provisions of Section 6 of the Settlement Agreement to implement the Settlement Agreement in good faith.

72.     The Settlement Agreement is also subject by common law to an implied covenant of good faith and fair dealing.

73.     Defendant breached the express and implied covenants of good faith and fair dealing by, *inter alia*, the following:

a.     Defendant eviscerated, through Congress' passage of 2009 Act and OPM's adoption of the 2010 Regulation, the primary benefit and very purpose of the Settlement Agreement—providing the *Caraballo* Class the right to receive fair and reasonable compensation for the extremely high costs of living and other unique circumstances in the non-foreign areas—by eliminating COLA in favor of locality pay;

b.     Defendant developed and implemented the New Methodology without notice and opportunity for the *Caraballo* Class and others to provide meaningful comment and be considered as part of a forum for full discussion, all in breach of Section 10.4.3 of the Settlement Agreement;

c.     Defendant developed and implemented the New Methodology without cooperation from and consultation with the Survey Implementation Committee and other committees, including the TAC, established by the Settlement Agreement, in breach of Sections 6 & 7 of the Settlement Agreement;

d.     Defendant departed radically in many ways from the Conforming Methodology required to be applied, including but not limited to affecting a reduction in COLA rates of more than one percent (1%) per year and reducing COLA rates in several areas below the minimum levels required by the Conforming Methodology, and eliminating the three-year cycle of price surveys; and

e.     Defendant, through the development and implementation of the New

Methodology, violated the enforceable legal mandate that requires pay of equal value for work of equal value, including by placing Puerto Rico, the U.S. Virgin Islands, Guam, and the Northern Mariana Islands (and certain other non-foreign areas which are not eligible for COLA) in the Rest of U.S. (RUS) locality pay area.

74.     Defendant, acting through OPM, its officers and agents, further breached the express and implied covenants of good faith and fair dealing by, *inter alia*, the following:

a.     Disseminating many false, incomplete, and/or misleading statements and omissions to members of Congress, the members of the class, federal employee groups, federal employees, and members of the public for the purpose of drumming up support for the transition from COLA to locality pay, including misrepresenting that the 2009 Act would "protect" the take home pay of federal employees;

b.     Failing to inform Congress, in a full and fair manner, unbiased by the parochial interests of certain agencies and of OPM itself, of Defendant's general and specific obligations under the Settlement Agreement, of the contractual rights of *Caraballo* Class members to retain the fruits of the Settlement Agreement,  of the express and implied duties of good faith and fair dealing imposed on Defendant by the Settlement Agreement and common law, and that the legislation OPM was proposing would constitute a manifold breach of the Settlement Agreement;

c.     Failing to disclose to Congress basic information having a fundamental bearing on the legislation under consideration, including failing to present any alternatives to the legislative approach it preferred, *i.e.*, to eliminate COLA entirely and replace it with locality pay;

d.     Failing to apprise Congress and federal employees of the limitations of the

locality pay program and methodology, and of the fact that converting COLA to locality pay inevitably would result, regardless of how fast or slow the transition, in lower salaries and living standards for federal employees in non-foreign areas as compared with salaries and living standards of all other federal employees in the United States;

e.      Following the passage of the 2009 Act, abandoning the Conforming Methodology and proceeding to issue a regulation in further breach of the Settlement Agreement; and

f.      Failing to utilize its grants of rulemaking, including but not limited to those provided under Section 1918(a) of the 2009 Act, 5 U.S.C. § 5304(i), and 5 U.S.C. § 5305, to avoid, mitigate, or rectify the various breaches of the Settlement Agreement and of the express and implied covenants of good faith and fair dealing.

75.      As a result of Defendant's breaches of the express and implied covenants of good faith and fair dealing, Plaintiffs and members of the Class each have been damaged in excess of $10,000, in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and the Class, hereby pray for the following relief:

a.      An order acknowledging that the Class for which Plaintiffs bring their claims includes the class previously certified by the District Court in *Caraballo* and dispensing with any further class certification considerations under Rule 23 of the Federal Rules of Civil Procedure or any applicable rules of court;

b.      Judgment to be entered in favor of Plaintiffs and the Class against Defendant on Plaintiffs' claim for breach of the express terms of the Settlement Agreement;

c.      Judgment to be entered in favor of Plaintiffs and the Class against Defendant on Plaintiffs' claim for breach of the express and implied covenants of good faith and fair dealing;

d.      Monetary damages in an amount to be determined at trial;

e.      An award of attorneys' fees and costs in favor of Plaintiffs and against Defendant; and

f.      Such other relief, at law or in equity, as is deemed just and equitable by the Court.

DATED this 3rd day of March, 2015.

By: _Alexander M. Bullock on behalf of Chad D. Hansen_

Chad D. Hansen (NC Bar No. 32713)
Kilpatrick Townsend & Stockton, LLP
1001 West Fourth Street
Winston-Salem, NC  27101-2400
Telephone:  (336) 607-7352
Facsimile:  (336) 734-2780
chansen@kilpatricktownsen.com

*Attorney for Plaintiffs*

*Of Counsel:*

David C. Smith (DC Bar No. 998932)
Kilpatrick Townsend & Stockton, LLP
607 14th Street, NW, Suite 900
Washington, DC  20005-2018
(202) 508-5865
dcsmith@kilpatricktownsend.com

Thurston H. Webb (NC Bar No. 40159)
Kilpatrick Townsend & Stockton, LLP
1001 West Fourth Street
Winston-Salem, NC  27101-2400
 (336) 607-7494
twebb@kilpatricktownsend.com

Robert G. Mullendore
ROBERT G. MULLENDORE, P.S.
310 West Spruce Street
Missoula, MT 59802
(406) 239-8300

Robert K. Baldwin (MT Bar No. 3248)
Trent M. Gardner (MT Bar No. 7477)
Jeffrey J. Tierney (MT Bar No. 12989)
GOETZ, BALDWIN & GEDDES, P.C.
35 N. Grand
P.O. Box 6580
Bozeman, MT 59711-6580
(406) 587-0618
rbaldwin@goetzlawfirm.com
tgardner@goetzlawfirm.com
jtierney@goetzlawfirm.com

Kevin A. Rames (VI Bar No. 193)
Semaj I. Johnson (VI Bar No. 1151)
K.A. Rames, P.C.
2111 Company Street, Suite 3
Christiansted, St. Croix
U.S. Virgin Islands 00820
(340) 773-7284
kevin.rames@rameslaw.com
semaj.johnson@rameslaw.com

Raul M. Arias (PR Bar No. 209706)
Francisco G. Bruno (PR Bar No. 117011)
Luis R. Román-Negrón (PR Bar No. 225001)
McConnell Valdés LLC
P.O. Box 364225
San Juan, PR 00936-4225
270 Muñoz Rivera Ave.
Hato Rey, PR 00918
 (787) 250-2604
rma@mcvpr.com
fgb@mcvpr.com
lrrn@mcvpr.com

*Attorneys for Plaintiffs*